IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| GWENDOLYN E. MOORER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action    03-1265 |
| | ) | |
| VERIZON COMMUNICATIONS, INC. | ) | |
| | ) | |
| Defendant. | ) | |


MEMORANDUM ORDER

CONTI, District Judge

　　In this memorandum order, the court considers the motion for summary judgment (Doc. No. 35) filed by defendant Verizon Services Corp[1]. ("defendant" or "Verizon") with respect to all claims against Verizon asserted by plaintiff Gwendolyn E. Moorer ("plaintiff" or "Moorer"). After considering the joint statement of material facts, the respective motions and briefs submitted by the parties, and defendant's reply brief, the court will grant summary judgment in favor of defendant as to all claims for the reasons stated below.

---

[1]Verizon Communications, Inc. is improperly identified as the defendant in the above-captioned matter.  It never employed plaintiff.  Rather, plaintiff was an employee of Verizon Services Corp.  In this motion, the court will refer to Verizon Services Corp. as defendant or Verizon.

*Factual Background*

## I.    Plaintiff's Employment

Plaintiff began her employment with The Bell Telephone C ompany of Pennsylvania as an Associate Account Executive in Pittsburgh, Pennsylvania on June 11, 1985.  Joint Statement of Material Facts ("J.S."), ¶ 1.  Plaintiff became a Verizon employee in or about the year 2000, but her seniority dates back to her June 11, 1985 hiring.  Id.  Plaintiff was a 49-year old African-American female at the time of her discharge.  Id. ¶ 2.  Plaintiff was promoted to Account Executive in December of 1986 and earned $34,477.00 per year in that position.  Id. ¶ 3. Plaintiff was promoted to that position based upon her successful completion of the Account Executive Certification Process.  Id. ¶ 62.  Later in her tenure, plaintiff became a Corporate Account Manager ("CAM") in Verizon's Enterprise Sales Group ("ESG Group") in Pittsburgh. Id.  ¶ 4.

Robert Donadio ("Donadio") became the regional sales manager for the Pittsburgh ESG Group in 1998.  Id.  ¶ 5.  Donadio is a white male and was 48 years old at the time of plaintiff's discharge.  Id.  Donadio, as regional sales manager, supervised approximately one-half of the CAMs in the Pittsburgh ESP Group, including plaintiff.  Id.  ¶ 6.  Dennis Muir ("Muir"), as the other regional sales manager for the Pittsburgh ESG Group, supervised the other CAMs.  Id.  ¶ 7. Muir was a 48-year old white male at the time of plaintiff's discharge.  Id.

Donadio's and Muir's immediate supervisor was Dennis Nolan ("Nolan"), General Manage of Branch Operations.  Id.  ¶ 8.  Nolan's immediate superior was Alex Coleman ("Coleman"), Vice President for Sales, Atlantic South Region, ESG Group.  Id.  ¶ 9.  Coleman is an African-American male and was 41 years old at the time of plaintiff's discharge.  Id.

Plaintiff was promoted to Senior Corporate Account Manager ("Senior CAM") in the Pittsburgh ESG Group in December 2000.  Id.  ¶ 10.  As a Senior CAM, plaintiff was responsible for a number of accounts and her job was to sell wireless data, voice systems, and services to her assigned clients.  Id.  ¶ 15.  Donadio recommended that plaintiff be promoted to that position and plaintiff was promoted, at least in part, on her successful completion of the certification process. Id.  ¶ 11, 63.  Plaintiff testified that her relationship with Donadio, her immediate superior, was a good one.  Id.  ¶ 12.  During the time of plaintiff's employment, plaintiff was the only African-American salesperson in the Pittsburgh ESG Group.  Id.  ¶ 96.

## II.   The Assignment of Accounts Within the Pittsburgh ESG Group

The ESG Group in Pittsburgh was assigned a group wide sales goal.  Id. ¶ 13.  All CAMs, assigned to the ESG Group in Pittsburgh, were assigned portions of the overall sales goal for the group as individual sales objectives.  Id.  ¶ 13.  Plaintiff was one of several Seniors CAMs in the group supervised by Donadio.  Id.  ¶ 14.  Donadio was responsible for assigning accounts to all CAMs under his supervision, including the plaintiff's accounts.  Id.  ¶ 16.  Plaintiff did not set the sales goals of other CAMs or Seniors CAMs.  Id.  ¶ 18.  Plaintiff's sales quota was equal to or less than the sales goals of other CAMs in the Pittsburgh ESG Group.  Donadio deposition, Exhibit C to Appendix of Joint Statement of Material Facts ("Donadio depo.") at 57-58.  All CAMs assigned to Donadio, at one time or another, asked for different or additional accounts in their account modules.  J.S. ¶ 19.  Accounts were designated as Tier I or Tier II in the years 2001-2002.  Id.  ¶ 21.  An account's designation as Tier I or Tier II did not limit the fees that the account could generate.  Id.  ¶ 24.  Tier I accounts are generally bigger accounts and have a dedicated service manager.   Donadio depo. at 53.   Neither Donadio nor anyone else in the ESP

3

Group were responsible for designating accounts as Tier I or Tier II accounts.  Donadio, however, knew whether an account was designated as Tier I or Tier II when he assigned them. Id. ¶ 25; Donadio depo. at 36.  The determination of the status of an account was made by the Service Management Group.  J.S. ¶ 25.

Plaintiff's complaints about the accounts in her module focused on two areas: (1) she wanted more Tier I accounts, and (2) she wanted more accounts that did not have low bid requirements.  Id. ¶ 20.  In fact, plaintiff specifically asked Donadio to reclassify some of her accounts as Tier I.  Id. ¶ 26.  Donadio contacted the Service Management Department on behalf of plaintiff and requested that some of plaintiff's accounts be reclassified.  Id.  The Service Department, in response, told Donadio that they could not reclassify plaintiff's accounts and that only 50 accounts could be classified as Tier I accounts.  Id.  The Service Department stated that all 50 Tier I accounts had already been designated.  Id.  Only a small portion of the accounts in the Pittsburgh ESG Group were Tier I accounts.  Id.

Michael Kelly ("Kelly") testified that Donadio "went to bat" for plaintiff and other CAMs when they asked for help with accounts.  Id. ¶ 27.  Plaintiff, per her request, received additional accounts for her module in 2001 and 2002.  Id. ¶ 28.

Plaintiff had some low bid requirement accounts in her account module.  Id. ¶ 30.  The term "low bid" refers to accounts with government agencies.  Id. ¶ 29.  These agencies are required by law to procure services from the lowest qualified bidder.  Id.

Kelly testified that low bid contracts were common and that CAMs other than the plaintiff also had low bid accounts in their module.  Id. ¶ 31.  Kelly further testified that Eric Hughes ("Hughes"), a Caucasian male born on December 17, 1956, had more low bid accounts

4

than plaintiff.  Id.  Plaintiff never complained that the assignment of her accounts was based on alleged race, gender, or age discrimination.  Id.  ¶ 32.

III.   **Plaintiff's Job Improvement Plan**

In the ESG Group, CAMs and Senior CAMs had different monetary sales goals based on the size of their account module.  Id.  ¶ 33.  All Senior CAMs and CAMs, however, had the same minimum percentage requirement.  Id.  Each was required to meet 65% of their respective sales quotas.  Id.

Three CAMS in the Pittsburgh ESG Group did not meet the 65% threshold in 2001: plaintiff, Randy Zortman ("Zortman"), and Marc Anthony ("Anthony").  Id.  ¶ 34.  It is the policy of Verizon that CAMs who fail to achieve 65% or higher of their individual sales quotas are to be placed on a Job Performance Improvement Plan ("JPIP").  Id.  ¶ 35.  Plaintiff, Zortman, and Anthony were all placed on JPIPs in January of 2002.  Id.  ¶ 36.

Plaintiff was informed by Donadio, in a memorandum dated January 3, 2002, that she was being placed on a JPIP.  Id.  ¶ 37.  Donadio sent similar memorandums, on the same day, to Zortman and Anthony.  Id.  ¶ 38.  Donadio, as part of the JPIP procedure, met with plaintiff to discuss her progress.  Id.  ¶ 39.

Plaintiff, Zortman, and Anthony did not improve to the 65% level after 90 days of the JPIP.  Id.  ¶ 40.  JPIPs generally last for 90 days.  Id.  ¶ 41.  JPIPs can be extended to provide additional time for a CAM to improve his or her performance.  Id.  Donadio recommended that plaintiff, Zortman, and Anthony all have their JPIPs extended for an additional 90 days.  Id.  ¶ 42.  Verizon accepted Donadio's recommendation.  Id.

5

After more than 180 days on their JPIPs, plaintiff, Zortman, and Anthony failed to increase their individual sales to the 65% requirement.  Id.  ¶ 44.  Donadio had no ability to recommend a further extension of JPIPs.  Id.  ¶ 45.

**IV.    Plaintiff's Discharge From Verizon**

Plaintiff, Zortman, and Anthony were all discharged in September 2002.  Id.  At the time of their September 2002 discharges, plaintiff, an African-American female, was 49 years old, Zortman, a white male, was 44 years old, and Anthony, a white male, was 41 years old.[2]  Id.  ¶ 46.  Coleman made the decision to terminate the employment of plaintiff, Zortman, and Anthony. Id.  ¶ 47.  Donadio met with plaintiff on September 9, 2002, to inform her of her discharge.  Id.  ¶ 49.  Donadio received credit for the sales made by Seniors CAMs and CAMs under his supervision.  Id.  ¶ 48.  The discharge of plaintiff, Zortman, and Anthony, therefore, had a negative impact on Donadio's ability to meet his personal sales objectives.  Id.

The termination memorandum sent to plaintiff informed her that her discharge would be effective as of September 30, 2002,unless she secured another position with Verizon by that date. Id.  ¶ 50.  The memorandum stated that if plaintiff did secure another position with Verizon by that date, her "transfer would be processed accordingly."  Id.  Donadio encouraged plaintiff to apply for other positions within Verizon and offered to work with her to find another position. Id.  ¶ 51.  Plaintiff testified that other Verizon managers also tried to help her find another position with the company.  Id.  Neither Donadio nor Coleman were involved in the hiring decisions with respect to any internal Verizon positions for which plaintiff applied after being

---

[2]Verizon discharged Lew Engle ("Engle"), a CAM in the Pittsburgh ESG Group, for failing to meet 65% of his sales objectives after being placed on a JPIP in 2001.  Id.  ¶ 57.  Engle, a white male, was 44 years old at the time of his discharge.  Id.

notified of her discharge.  Id.  ¶ 52.  Plaintiff, Zortman, and Anthony did not secure another position with Verizon and their employment terminated on September 30, 2002.  Id.  ¶ 53.

Verizon has a written no-discrimination policy that prohibits discrimination on the basis of race, age, or gender.  Id.  ¶ 54.  The policy is distributed to employees and encourages employees to report alleged discrimination.  Id.  Plaintiff never complained about race, gender, or age discrimination to Donadio or any other Verizon management employee.  Id.  ¶ 55.

## V.      Events Subsequent to Plaintiff's Discharge

Donadio transferred out of the Pittsburgh ESP Group and became a Long Distance Sales Manager in February 2003.  Id.  ¶ 56.  After Donadio's transfer, Verizon promoted Karyn Shade ("Shade"), a white female whose birth date is April 27, 1960, and who previously served as a CAM in the Pittsburgh ESG Group, to Donadio's managerial position.  Id.  ¶ 56.

On March 3, 2003, plaintiff filed a charge of race, age, and gender discrimination with the Equal Employment Opportunity Commission ("EEOC").  Id.  ¶ 58.  The EEOC dismissed plaintiff's charge with a "no-cause" finding.  Id.  ¶ 60.  Plaintiff filed a complaint in the United States District Court for the Western District of Pennsylvania on August 26, 2003, against Verizon alleging that her discharge in September of 2002 violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq.  Id.  ¶ 61.

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." FED.R.CIV.P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party.  Id. at 249.  The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment.  Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing WRIGHT AND MILLER, FEDERAL PRACTICE § 2721); Pollack v. City of Newark, 147 F.Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1956), cert.denied, 355 U.S. 964 (1956) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or *otherwise made admissible in evidence*") (emphasis added).

## *Analysis*

## I. Plaintiff cannot state a *prima facie* case for gender or race discrimination under Title VII

Title VII was enacted to prohibit employers from discriminating against employees with respect to the compensation, terms, conditions, or privileges of employment.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 259 (1981).  Since its inception, Title VII has made it an "unlawful employment practice for any employer . . . to discriminate against any individual . . . *because of* such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).  The Supreme Court recognized several years after the passage of Title VII that it is often difficult for a plaintiff to prove that an employer acted with "conscious intent to

discriminate." McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). One manner in which plaintiffs can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action was not the true reason, but rather was a pretext for unlawful discrimination. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 247, 253 (1981). In McDonnell Douglas, the Supreme Court developed the now familiar burden-shifting framework for courts to utilize as a tool in analyzing disparate treatment claims. The familiar McDonnell Douglas framework requires a plaintiff alleging a violation of Title VII to first establish a *prima facie* case of discrimination. The *prima facie* case, the elements of which depend upon the type of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 & n.6 (1981). In so doing, the *prima facie* case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Id. at 254.

If the plaintiff successfully demonstrates a *prima facie* case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment decision. Simpson v. Kay Jewelers, 142 F.3d 639, 644 n.5 (3d Cir. 1998). The burden on the defendant at this junction is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." Fuentes v. Perskie, 32 F.2d 759, 763 (3d Cir. 1994) (emphasis added).

Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, "the McDonnell Douglas framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [i]s discrimination *vel non*." See Reeves v. Sanderson

9

Plumbing Products, Inc., 530 U.S. 133 (2000). The plaintiff, thus, has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

The court need not engage in a McDonnell Douglas burden shifting analysis because plaintiff failed to adduce sufficient evidence to support a *prima facie* claim for either race or gender discrimination under Title VII. To state a claim for discrimination under Title VII, a plaintiff must show that: (1) she was a member of the protected class; (2) she was qualified for the position; (3) she was discharged; and (4) similarly situated employees who are not members of the protected class were treated more favorably. Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 318-19 (3d Cir. 2000); Jones v. School Dist. Of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999); Jackson v. University of Pittsburgh, 826 F.2d 230, 233 (3d Cir. 1987).

It is undisputed that plaintiff satisfies the first three prongs of the test under Goosby[3] for both claims. Goosby, 228 F.3d at 318-19. Defendant asserts that plaintiff cannot meet the fourth prong and thus cannot show, based upon the record, that she was discriminated against on the basis of her gender or her race. Plaintiff, however, claims that she was "set up to fail" by Donadio.

**A.      Racial Discrimination**

As to plaintiff's claims for racial discrimination, despite plaintiff's assertion, the court cannot find adequate support in the record to support plaintiff's position. The record reflects that plaintiff and two younger white males, Anthony and Zortman, were placed on JPIPs in January of

---

[3]Defendant does not even address the first three prongs of the framework. See Def.'s Br. at 7-8.

2002 for failure to meet 65% of their respective sales quotas.  After a 90-day period, none of the three CAMs had improved their sales to meet the 65% threshold.  Defendant treated all three employees in the same manner and extended the JPIPs for an additional 90 days.  After failing to reach the 65% threshold after the second 90 days, plaintiff, Anthony, and Zortman were terminated.  In addition, Engle, a 45 year-old white male, was discharged for the same reason. Finally, in plaintiff's deposition, she was asked directly whether she was aware of any white employee of Verizon in Pittsburgh that was not terminated despite failing to reach the 65% threshold.  The plaintiff responded that she was not aware of any such employee.

Plaintiff argues that she was "set up to fail" by Donadio in that she was given only Tier II accounts.  Having Tier II accounts, however, does not demonstrate the she was set up to fail.  The record reflects that Hughes, a white male, had more lower bid contracts in his module than did plaintiff and that Donadio sought Tier I account status for certain of plaintiff's accounts but was advised that were only 50 Tier I accounts and that they had already been allocated.  Reviewing the record, the court can find no evidence to support the fourth prong of plaintiff's *prima facie* case.  There was no evidence that similarly situated employees who were not members of the protected class were treated more favorably.

### B.    Gender Discrimination

As to plaintiff's claim for gender discrimination, the court also cannot find adequate support in the record to support a finding that plaintiff established a *prima facie* case.  As stated above, plaintiff was treated in the same manner as two other Verizon employees who were males. It is undisputed that defendant promoted Shade, a female colleague of plaintiff, to Donadio's position in February of 2003.  In fact, plaintiff admitted at her deposition that Shade, a fellow female, had been treated better than plaintiff while plaintiff was employed at Verizon.

11

The court again notes that plaintiff failed to cite to any evidentiary material in the record to support her argument.  Plaintiff did not show that she was assigned inferior accounts while males were either not assigned those accounts or received better accounts.  Plaintiff presented insufficient evidence to demonstrate that she was treated differently than similarly situated employees who were not members of the protected classes[4].

## II.    Plaintiff cannot state a *prima facie* case for age discrimination under the ADEA

This case, like all cases brought under the ADEA, is governed by the shifting burdens framework under McDonnell Douglas Corp. v Green, 411 U.S. 792 (1973) and its progeny. Under that framework, a plaintiff alleging age discrimination must first prove a *prima facie* case of age discrimination by demonstrating that she is: (1) a member of the protected class, that is, at least 40 years of age; (2) qualified for the position; (3) suffered an adverse employment decision; and (4) in the case of a demotion or discharge, was replaced by a sufficiently younger person to create an inference of age discrimination.  See Simpson v. Kay Jewelers Division of Sterling, Inc., 142 F.3d 639, 644 n.5 (3d Cir.1998).  If the plaintiff successfully demonstrates a

---

[4]The court notes that plaintiff's brief describes facts that are not supported by the record. For example, plaintiff states that, "...Mr. Donadio was the one who recommended Plaintiff's termination and could, if he desired, recommend that [plaintiff's JPIP] be extended." Pl.'s Brief at 11.  The joint statement of material facts submitted to the court, however, tells a different story.  Paragraph 45 of the joint statement states:  "Mr. Donadio had no ability to extend their JPIPs any further...." J.S. ¶ 45.  Plaintiff did not dispute this fact, but rather admitted that it was material and undisputed.  She only disputed the reasons for termination in paragraph 45.  In addition, plaintiff stated:  "Though a Senior CAM, she was given no Tier I accounts and was given accounts with the lowest possible bid requirement."  Pl.'s Brief at 11.  That argument misstates the factual record.  During her deposition, plaintiff stated that she did have accounts, such as the City of Pittsburgh, the School District of Pittsburgh, and West Penn Allegheny Health System, that were Tier I accounts.  Moorer Dep. at 50.  Plaintiff testified that those accounts were downgraded from Tier I to Tier II.  Id.  It is undisputed that neither Donadio nor anyone else in the Pittsburgh ESG Group was responsible for designating those accounts.  J.S. ¶ 25.  Those accounts were designated by the Service Management Division.  Id.  It is undisputed that Donadio contacted the Service Management Division on plaintiff's behalf and asked that some of plaintiff's account be re-classified as Tier I.  J.S. ¶ 26.

*prima facie* case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment decision.  Simpson, 142 F.3d at 644 n.5.  If the employer meets its burden of demonstrating a legitimate, non-discriminatory reason for the employee's termination, the plaintiff must present proof that the employer's articulated reason was not the actual reason, but rather a pretext for discrimination.  Id.

In this case, plaintiff cannot state a *prima facie* case of age discrimination.  It is undisputed that plaintiff satisfies the first three prongs of the test under Simpson[5].  Simpson, 142 F.3d at 644n.5.  First, plaintiff, who was born October 8, 1952, is a member of the protected class.  Second, defendant does not challenge plaintiff's qualifications for the position of Senior CAM.  Third, plaintiff's termination qualifies as an adverse employment action.

Finally, as to prong four, the court can find no evidence in the record that plaintiff was replaced by a sufficiently younger person such that an inference of age discrimination could be raised.  In fact, on the date of her termination two other Senior CAMS, both younger than plaintiff, were also terminated.   Plaintiff admitted during her deposition that she knew of no employee younger than her that was retained despite failing to meet the 65% threshold.

Plaintiff argues that she "need not show that defendant discriminated against all its employees on the basis of age or gender, merely that it discriminated against her."  The court agrees.  While the burden of showing a *prima facie* case is a relatively light burden, the court simply cannot find sufficient evidentiary support in the record for plaintiff's claim that

---

[5]Defendant does not even address the first three prongs of the framework.  See Def.'s Br. at 9.

defendant discriminated against her on the basis of her age.  Plaintiff failed to satisfy prong four of the test for a *prima facie* case of discrimination under the ADEA.

### III.    The McDonnell Douglas Framework

The court feels compelled to add that, even if plaintiff could establish a *prima facie* case for discrimination on the basis of race, gender, or age,  the defendant would still prevail under the McDonnell Douglas framework.  As stated earlier, under McDonnell Douglas, once the plaintiff has established a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment decision.  Simpson, 142 F.3d at 644 n.5.  This is a "relatively light," burden and the defendant can satisfy this burden "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision."  Fuentes, 32 F.2d at 763.  The employer, under this framework, need not show that the reason if offers actually motivated its behavior[6].  Id.  In this case, defendant asserted that plaintiff was terminated due to her inability to reach the 65% threshold of her sales goal quota.  That assertion is supported by evidence in the record and certainly satisfies defendant's burden of production under McDonnell Douglas.

With respect to the final part of the test, "[o]nce the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)."  Fuentes, 32 F.3d at 763.  As to this last prong of the test, the court again notes

---

[6]The court reiterates that, at this stage in the burden shifting analysis under McDonnell Douglas, the burden of *production* shifts to the defendant.  At all times, however, the burden of persuasion rests with the plaintiff.    Fuentes, 32 F.3d at 763; Simpson v. Kay Jewelers, 142 F.3d at 644 n.5.

that it simply cannot find adequate evidence of record to support plaintiff's contention that the reasons offered by the defendant were not its true reasons, but a pretext to discriminate against plaintiff.  Plaintiff's own subjective belief that she was discriminated against, absent evidentiary support in the record, means that she would not ultimately prevail, even if she could state a *prima facie* case, under the <u>McDonnell Douglas</u> framework on any of her claims.

The United States Court of Appeals for the Third Circuit developed the following two-prong test (the "<u>Fuentes</u> test") formulating the standard a plaintiff must meet in order to survive summary judgment when the employer articulates a legitimate, non-discriminatory reason for the plaintiff's termination:

> In order to survive summary judgment when the employer articulates a legitimate non-discriminatory reason for its action, plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

<u>Fuentes</u>, 32 F.3d at 764.  The two prongs of the <u>Fuentes</u> test are distinct and have been analyzed under different standards in subsequent court decisions.  Both prongs of the <u>Fuentes</u> analysis will be reviewed to determine whether sufficient evidence was presented to defeat summary judgment.  <u>See</u> <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108-1113 (3d Cir. 1997) (analyzing ADEA action under both prongs of <u>Fuentes</u> framework).

## I.    Prong One

Prong one of the <u>Fuentes</u> test focuses on whether the plaintiff submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reasons for

the plaintiff's termination.  Under this prong, the plaintiff must point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer that the proffered non-discriminatory reason 'did not actually motivate' the employer's action." Simpson, 142 F.3d at 644.  The district court under this prong must focus on the legitimate, non-discriminatory reason offered by the employer.  Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 531(3d Cir. 1992) (stating that a plaintiff "does not establish pretext . . . by pointing to criticisms of members of the non-protected class, or commendation of the plaintiff, in categories the defendant says it did not rely upon[.]").  The court is neither permitted to get involved in the subjective business decisions of the employer, nor set its own employment standards for the employer, unless there is evidence of discrimination.  Ezold, 983 F.2d at 527 (3d Cir. 1992).  Furthermore, the court should not examine the issue of whether the employee has skills in an area *other than that identified by the employer* as the basis for his or her termination, because the court then would be impermissibly substituting its own business judgment for that of the employer.

Decisions in this context usually turn upon whether the employer's stated reason for termination is so implausible that a reasonable factfinder could not believe it.  For example, in Brewer v. Quaker State Oil Refining Corporation, 72 F.3d 326 (3d Cir. 1995), the plaintiff was terminated for deficient sales performance.  The evidence of record, however, disclosed that Brewer received a bonus three months before he was fired and that he was the only sales representative in his region who received such a bonus.  The court held that, where the primary measure of Brewer's performance was sales, and where he was the leading salesperson in the region, his employer's stated reason for his termination was "contradictory to [its] admission

that the most important standard of job performance is sales." Id. at 332.  According to the court, "[a] factfinder could find it implausible that Quaker State would have fired Brewer for such deficiencies when he was successful in the sole area identified by Quaker State's own performance incentive program – sales." Id.

Similarly, in Sempier v. Johnson & Higgins, 45 F.3d 724 (3d Cir. 1995), the employer stated that Sempier was terminated based upon poor performance that caused the company to restructure the nature of his responsibilities.  The evidence of record, however, disclosed that (1) Sempier never received any unfavorable criticism that his performance was poor or inadequate; and (2) the employer failed to produce any other evidence of poor performance or to make specific allegations of Sempier's deficiencies. Id. at 731-733.  Thus, there was evidence on the record that a reasonable factfinder could conclude that the reason given by Sempier's employer was a pretext for age discrimination. Id. at 732-33.

In this case, defendant terminated plaintiff for her inability to reach the 65% threshold of her sales quota.  The court is unable to find any evidence of record that shows inconsistencies, weaknesses, or implausibilities in the defendant's stated position.  See Keller, 130 F.3d at 1108-09; Fuentes, 32 F.3d at 765.  Plaintiff argues that Donadio "set her up to fail" by assigning her inferior accounts[7].  While the court understands plaintiff's argument, the court is unable to see how this argument supports a finding, under this prong of the framework, that defendant's reason for terminating plaintiff is "unworthy of credence." Id.  The evidence of record shows that not only did plaintiff believe that she had a good working relationship with Donadio, but it

---

[7]A plaintiff's subjective opinion that she was treated unfairly is not enough to show pretext.  Rather, the *evidence of record* must support a finding that the defendant "made up" its reason. Castleman v. Acme Boot Co., 959 F.2d 1417, 1422 (7th Cir. 1992).

also shows that Donadio made calls on plaintiff's behalf to the Service Management Division to attempt to get some of plaintiff's accounts upgraded to Tier I.

It is not the function of this court to determine whether defendant's business judgment in terminating plaintiff was correct.  Rather, the court must view the evidence to determine whether defendant's stated reasons for terminating plaintiff could reasonably be found by a jury to be pretextual.  Under the facts of this case, the court finds that plaintiff failed to present evidence sufficient for a reasonable jury to conclude that the stated reasons for her termination "did not actually motivate the employer's action."  Unlike the facts in Brewer or Sempier, the evidence of record in this case demonstrates that the reasons relied upon by defendant for plaintiff's termination actually occurred.

Verison has not been inconsistent in presenting the reasons for plaintiff's termination. Abramson v. Wm. Patterson College of N.J., 260 F.3d 265, 289 (3d Cir. 2001).  Neither are there any inconsistencies in stating who actually made the decision to terminate plaintiff.  See Sabbrese v. Lowes, No.Civ.A. 02-1010, slip op. (W.D. Pa. June 2004).  It is undisputed that the ultimate decision to terminate plaintiff was made by Coleman, an African-American male.  The court finds that plaintiff failed to present sufficient evidence to allow a factfinder reasonably to conclude that defendant's legitimate, non-discriminatory reasons for terminating plaintiff's employment were pretextual under the first prong of the Fuentes test.

## II.   Prong Two

The court is next required to examine the second prong of the Fuentes framework to determine if plaintiff presented sufficient evidence of pretext.  This prong permits plaintiff to survive summary judgment if she can demonstrate, through evidence of record, that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of

18

the employer's action.  <u>Fuentes</u>, 32 F.2d at 764.  With respect to this prong, the United States

Court of Appeals for the Third Circuit stated: "To show that discrimination was more likely

than not a cause for the employer's action, the plaintiff must point to evidence with ***sufficient***

***probative force*** that a factfinder could conclude by a preponderance of the evidence that age was

a motivating or determinative factor in the employment decision."  <u>Simpson</u> 142 F.3d at 644-45

(3d Cir. 1998) (emphasis added).  The types of evidence relied upon by the court of appeals

under this prong of the <u>Fuentes</u> analysis are: (1) whether the employer previously discriminated

against the plaintiff; (2) whether the employer has discriminated against other persons within the

plaintiff's protected class or within another protected class; and (3) whether the employer has

treated more favorably similarly situated persons not within the protected class.  <u>Id</u>.  The court

will examine whether plaintiff submitted sufficient evidence under each of the three types listed

above.

> **A.**    **Evidence of previous discrimination against plaintiff**

It appears to this court that plaintiff made no attempt to argue that she suffered from

previous discrimination by defendant.  The court finds that the evidence shows that plaintiff was

promoted by defendant to the position of Senior CAM in December of 2000.  Donadio

recommended plaintiff be promoted to that position.  In addition, the record shows that not only

did Donadio contact the Service Management Division on the plaintiff's behalf, but he gave

additional accounts to plaintiff upon her request in 2001 and 2002.

> **B.**    **Whether the employer discriminated against other persons in plaintiff's**
> **protected class or another protected class**

Under this category, the court focuses on Verizon's treatment of its employees that fall

within a protected class for purposes of workplace discrimination laws.  According to the

stipulation of the parties in the joint statement, at the time of Moorer's termination she was the only African-American salesperson in the Pittsburgh ESG Group.

The United States Court of Appeals for the Third Circuit indicated that "[s]tatistical evidence of an employer's pattern and practice with respect to minority employment may be relevant to a showing of pretext." Ezold, 983 F.2d at 542. The court of appeals, however, also stated that raw numerical evidence alone is of little value without a demonstration of its significance to the employer's alleged discriminatory motive. Id.; Keller, 130 F.3d at 1112.

In this case, there is no evidence of record indicating that the defendant discriminated against other African-African employees. As to age or gender discrimination, the court finds that the evidence shows that the defendant was not discriminatory. On the day plaintiff was terminated, two other younger, white males were also terminated for failing to reach the 65% threshold of their sales quota. Defendant, in 2003, also promoted Shade, a 42-year old female, to Donadio's managerial position.

### C.   Whether employer treated more favorably similarly situated persons not within the protected class

The court again notes that it cannot find evidence in the record to support the argument that defendant treated plaintiff differently than other employees not within the protected classes. Plaintiff was terminated on the same day as two other younger, white male employees. All were given a 90-day JPIP period followed by an additional 90-day extension. As to discrimination on the basis of race, when asked in her deposition whether she was aware of any white Verizon employee that kept his or her position after failing to reach the 65% threshold of the relevant sales quota, her response was "no." Plaintiff's Deposition, at 148. As to discrimination on the basis of age, when asked in her deposition whether anyone younger than her who did not meet

the 65% threshold of the relevant sales quota was retained, plaintiff's response was "no." Plaintiff's Deposition, at 154. Finally, as to discrimination on the basis of gender, plaintiff testified in her deposition that she believed one woman, Shade, was actually treated *better* than her. Plaintiff's Deposition, at 99.

### *Conclusion*

After reviewing the undisputed material facts of record, the court determines that plaintiff did not produce sufficient evidence by which a reasonable factfinder could conclude that plaintiff met her burden of proving a *prima facie* case or even if she had, that defendant's reason for terminating plaintiff's employment was pretextual. Accordingly, summary judgment is granted in favor of defendant.

### *Order*

**AND NOW**, this 27th day of October 2005, upon consideration of the parties' arguments and supporting documents

**IT IS ORDERED** that defendant's motion for summary judgment (Doc. No. 35) is **GRANTED.**

**IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of defendant, Verizon Services Corp., improperly named as Verizon Communications, Inc., and against plaintiff, Gwendolyn E. Moorer.

The clerk shall mark this case closed.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

cc:    Counsel of record